UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MELISSA REDDINGER, et al.,

    Plaintiffs,

    v.                            Case No. 09-C-119, 09-C-141

SENA SEVERANCE PAY PLAN, et al.,

    Defendants.

**DECISION AND ORDER**

Plaintiffs Melissa Reddinger and Scott LeFebvre were employed by Defendant NewPage Corporation at NewPage's paper mill in Niagara, Wisconsin. In these related actions, both Plaintiffs claim they are owed severance benefits stemming from the closing of the Niagara mill. They filed a complaint in state court alleging breach of contract, estoppel, and two ERISA-based claims. The Defendants, which include NewPage and its severance plan, removed the case to federal court and have now moved for summary judgment. For the reasons that follow, their motions will be granted and the cases will be dismissed.

**I. BACKGROUND**

The Niagara paper mill was owned by Stora Enso North America, known as SENA, until it was bought by NewPage in December 2007. When the acquisition was consummated, SENA employees became employees of NewPage, and NewPage soon decided to close the Niagara plant. On January 16, 2008, John Reichert, the mill manager, announced that the plant would be closing

in April of that year. Both Plaintiffs soon began initiating contact with other employers. (DPFOF ¶¶ 41-42.) In letters dated March 10, NewPage followed up Reichert's announcement by informing the Plaintiffs and other employees that their official end date would be May 2, 2008, and the letters further stated that Plaintiffs would each receive severance payments – $7,227.54 for Reddinger (who had only recently become an employee), and $64,831.36 for LeFebvre – if they signed a release and severance agreement. Attached to their termination letters were copies of the SENA Severance Pay Plan, a plan that states it is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). (Smith Aff., Ex. A.) Like most severance plans, the SENA plan provided benefits to employees who were "involuntarily terminated," but not to those who voluntarily ended their own employment. (*Id.* at 1.) And, as noted above, a key condition of eligibility for severance benefits was the requirement that employees must sign a release: "No severance benefits will be paid or offered to an eligible employee until the employee has executed a Company-approved 'release of claims' form releasing all of the employee's then existing rights and legal claims against the Employers. The Company will determine in all cases whether an employee is eligible for benefits under the Plan." (*Id.* at 2.) Both Plaintiffs received "release of claims" forms and separation agreements along with their March 10 letters.

By March 24, neither Plaintiff had turned in their release forms, although both were planning to do so. On that date Reichert informed employees that the mill would actually remain open until October 2008 rather than closing in April. Reichert stated that because the company wanted employees to stay until October, it would not be accepting any more separation agreements from employees who had not turned them in already. Instead, employees would be receiving new termination dates and new severance agreements to sign.

2

Based on NewPage's earlier statements, both Plaintiffs had expected they would need to find some other kind of employment as of May 2008, and so the news that the mill would remain open until October came as a surprise. By March 24, both Plaintiffs had already begun planning for their post-NewPage lives: Reddinger had a job lined up, and LeFebvre was in talks with another company that eventually led to a job offer. On March 25, the day after learning that the mill would be remaining open longer than expected, both Plaintiffs signed and submitted the original releases and separation agreements they had received two weeks earlier. Since they were both in the process of lining up new jobs that would begin in May, Reddinger and LeFebvre were more interested in receiving the severance package than in working at NewPage for a few extra months.

As Reichert had indicated on March 24, NewPage refused to honor Plaintiffs' severance agreements because the mill's close date had changed and it wanted them to remain until October. NewPage did, however, offer Plaintiffs a retention bonus if they stayed until the mill closed. But because both Plaintiffs had made other arrangements, neither were interested in staying on. Accordingly, both Plaintiffs considered May 2 to be their termination date, and they both began new jobs on May 5. After they left NewPage, Reddinger and LeFebvre requested severance payments under the plan, but Bill Smith, the plan administrator, denied their claims. He informed them, through their attorney, that the plan only covered individuals who were "involuntarily terminated," and Smith deemed their termination to be voluntary. Specifically, he believed that because they submitted their separation agreements after learning that the plant would remain open and after being offered an incentive to stay, their termination was the product of their voluntary decision to leave rather than an involuntary termination by the company.

3

## II. ANALYSIS

Summary judgment is proper if the record establishes that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Summary judgment is particularly appropriate when, as here, the essential facts are uncontested and the outcome turns on resolution of legal questions such as the Plaintiffs' plan eligibility.

### A. ERISA § 502(a)(1)(B)

The most straightforward of Plaintiffs' claims is their attempt to recover benefits owed under an ERISA plan. *See* 29 U.S.C. § 1132(a)(1)(B). They allege that they were eligible for severance payments under the SENA severance plan and that the Defendants' failure to pay their benefits constitutes a clear violation of the terms of the plan.

As noted earlier, the Defendants' position is that Plaintiffs left on their own and thus were not "involuntarily" terminated. As a preliminary matter, it is clear that Defendants' position must be analyzed under the arbitrary and capricious standard. "In ERISA cases, denials of benefits are reviewed *de novo* unless the plan at issue gives the plan administrator discretion to construe the policy terms. Where a plan administrator is given discretion to interpret the provisions of the plan, the administrator's decisions are reviewed using the arbitrary and capricious standard." *Wetzler v. Illinois CPA Soc. & Foundation Retirement Income Plan,* 586 F.3d 1053, 1057 (7th Cir. 2009). Here, the severance plan stated clearly that "The Company will determine in all cases whether an employee is eligible for benefits under the Plan." (Smith Aff., Ex. A at 2.) In addition, the Plan specifically provided that the Company would act as the plan administrator and "will have sole authority and discretion to interpret, apply and administer the terms of the Plan and to determine eligibility for severance payments under the Plan . . ." (*Id.* at 3.)

4

Plaintiffs protest that deferential review should not apply because the Plaintiffs' eligibility for severance was actually a function of the company's decision to remain open rather than a reading of the plan terms themselves. The key decision was that because Plaintiffs had not turned in their release agreements by March 24 ("an entirely arbitrary date," Plaintiffs claim), they would be deemed ineligible. And because that decision had nothing to do with interpreting an ERISA plan, this Court should not afford Defendants with any kind of deferential review. In addition, because the "arbitrary" cut-off date for turning in severance agreements was based solely on the company's business considerations, Plaintiffs believe the administrator had a conflict of interest that should preclude deferential review.

Although Plaintiffs make a valiant effort to escape the arbitrary and capricious standard of review, they do not succeed. As a first principle, the only source of Plaintiffs' possible entitlement to severance benefits is the SENA plan itself, which is governed by ERISA. Because that was the only source of any right to severance payments, the administrator's decision to deny benefits was necessarily an application of that plan and its terms. In fact, that is exactly how Bill Smith, the company's designated administrator, treated the denial. In a letter to Plaintiffs' counsel, Smith cited the plan itself and noted that Reddinger "voluntarily left the company after learning that the mill would remain open. Thus, she is not a participant in the Plan and is not eligible to receive severance benefits under the Plan." (Smith Decl., Ex. G.) As such, it is clear that the Defendants' denial of benefits was based on an interpretation of the plan's language. It was not, in other words, the product of some "arbitrary" business decisions. And in any event, it is not clear how or why this Court should undertake a "*de novo* review" of the company's business decision to postpone the closing of its mill. Courts may review contracts and benefit plans to determine whether a

5

company's denial violated those agreements, but the company's business decisions are surely no business of a Court reviewing a denial of benefits under ERISA.

In addition, the mere fact that the company itself was the plan administrator does not give rise to the sort of bias or conflict of interest that would preclude application of the deferential review standard. In fact, Plaintiffs' argument is downright strange. They argue that the company was "biased" against them because it allowed other employees to receive severance (those who turned in their severance agreements earlier), and that because the company was closing it had no incentive to treat employees fairly. But this line of argument ignores the undisputed evidence that the company was trying to *retain* both of these employees. The company did not deny them severance payments because of bias, it denied severance payments because the Plaintiffs were not "severed" at all – they resigned despite the company's efforts to retain them. Accordingly, I conclude that the deferential standard of review applies.

From that conclusion it follows that the denial of benefits must be upheld.[1] To be eligible for severance, an employee must be involuntarily terminated. When an employer attempts to *keep* an employee by offering severance payments in the future, and when it sweetens the deal with a retention bonus, the employee who resigns in the face of those inducements cannot be said to have been "terminated" at all – much less involuntarily. That is all that happened here. The employer's about-face after sending termination notices adds several twists to the story, but the fact remains that when given a chance to remain employees of NewPage, the two Plaintiffs declined. The decision to end their employment was undoubtedly induced by NewPage's announcement that it would close

---

[1] In fact, as should be clear from the discussion herein, even under a *de novo* standard of review I could not find a reason to overturn the Defendants' denial of benefits.

6

in April, but all that means is that NewPage gave them an economic reason to quit when they did. It does not mean that NewPage actually forced their hand.

Plaintiffs' efforts to get around this rather unremarkable conclusion rest on a medley of theories of contract and estoppel. Principally, they contend that the terms of the March 10 letter were essentially set in stone. That letter informed Plaintiffs that they would be terminated and that May 2 would be their last day. In effect, they argue that the March 10 letter actually terminated Plaintiffs' employment, but their approach emphasizes form at the expense of substance. Giving notice to someone that he will be terminated in two months is not the same as actually terminating him. All the employer has done is give advance notice, a courtesy to employees to allow them to make other arrangements. The employer might just as easily have made the decision in secret and then broken the bad news on the employee's last day. The fact that it gave notice of the decision does not change the fact that until the deed is done, an employee who thinks he will be terminated has not been terminated. And when, two weeks later, he learns that he will have several more months of employment – *and* receive a retention bonus – he cannot claim his termination was involuntary. On March 25, the Plaintiffs were the initiators of the end of their employment, not NewPage.

In sum, although the unusual facts of this case have given rise to Plaintiffs' feelings of unfairness – especially since other employees who wanted out were apparently allowed severance packages – I cannot say that the administrator's denial of benefits was arbitrary, or even incorrect. The company's statements obviously induced Plaintiffs to find work elsewhere, but all this did was cause Plaintiffs to create a situation in which they *wanted* to be terminated on May 2. More specifically, it caused them to negotiate with other employers and obtain jobs that would begin on

7

May 5. Although that explains the Plaintiffs' desire to resign and to accept the severance package originally offered, creating an incentive to leave that later proves untimely is a far cry from an involuntary termination. Ultimately, the company's statements and the changed closing date created a scenario in which the Plaintiffs' termination on May 2 was no longer economically advantageous, but that does not mean their resignation was involuntary. Accordingly, the claim for ERISA benefits fails.

**B. ERISA Fiduciary Duty**

Plaintiffs also bring a claim alleging the Defendants breached their fiduciary duties under ERISA, although they merely point to ERISA § 404 without identifying which duties may have been violated. Section 404 imposes standards of fiduciary duty, including the fiduciary's duty to act "with the care, skill, prudence, and diligence" as would a prudent man under the same circumstances. 29 U.S.C. § 1104(a)(1)(B). That section also requires that a fiduciary must fulfill his duties "with respect to a plan solely in the interests of the participant and beneficiaries." 29 U.S.C. § 1104(a)(1). To state a claim for a violation of fiduciary duty, a plaintiff must establish: (1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff. *Brosted v. Unum Life Ins. Co. of America,* 421 F.3d 459, 465 (7th Cir. 2005) (citing *Kamler v. H/N Telecomm. Serv., Inc.,* 305 F.3d 672, 681 (7th Cir. 2002)).

Plaintiffs assert that the company decided it was *not* closing the mill around March 17, 2008, but it did not tell employees of the about-face until March 24. Thus, employees who wanted to take advantage of the severance offer had no idea that they needed to turn in their paperwork prior to March 24. This "non-action . . . induced the Plaintiffs' [sic] to continue relying on the time frames in the Agreements, to their detriment." (Pl. Br. at 25-26.) That is, Plaintiffs evidently believe the

8

Defendants maintained a fiduciary duty to inform them immediately either that the plant would remain open longer or that they needed to turn in their severance agreements right away if they wanted to accept the company's severance offer.

First, it is unclear how the company's "non-action" would have violated its fiduciary duties under ERISA. As the Seventh Circuit and other courts have recognized, "ERISA permits employers to wear two hats, and ... they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA. [W]hen an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards." *Fletcher v. Kroger Co.,* 942 F.2d 1137, 1139 (7th Cir. 1991) (citations omitted). And, as the Sixth Circuit explained in *Sengpiel v. B.F. Goodrich Co.*:

> courts have typically distinguished between employer actions that constitute "managing" or "administering" a plan and those that are said to constitute merely "business decisions" that have an effect on an ERISA plan; the former are deemed "fiduciary acts" while the latter are not. It is firmly established, for example, that "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." *Sutter v. BASF Corp.,* 964 F.2d 556, 562 (6th Cir. 1992) (quoting *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.1990)); *see also Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78 (1995) ("Employers or other plan sponsors are generally free under ERISA for any reason at any time, to adopt, modify, or terminate welfare plans.").

156 F.3d 660, 665 (6th Cir. 1998).

Thus, although the company's designated administrator had fiduciary responsibilities when administering the plan itself, that does not mean the employer must act as a fiduciary any time its actions affect a benefit plan. "Business decisions can still be made for business reasons,

9

notwithstanding their collateral effect on prospective, contingent employee benefits." *Dzinglski v. Weirton Steel Corp.,* 875 F.2d 1075, 1079 (4th Cir. 1989). The key question is whether the administrator was acting in his ERISA-fiduciary capacity or whether he was acting in his business capacity: "In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226 (2000).

Here, NewPage's decisions about whether to keep the mill open and when to tell employees about its decision had obvious repercussions for some employees' eligibility for ERISA benefits.[2] Even so, those were classic business decisions made not in the employer's role as a fiduciary (how could closing a mill and terminating employees be a fiduciary decision?) but as an employer. Countless business decisions, such as terminating an employee for cause (as in *Dzinglski*), have collateral effects on ERISA plans – an employee fired for cause would no longer be eligible for the severance plan, for example – but obviously these kinds of decisions are not governed by fiduciary standards. Plaintiffs' approach would clothe all of these business decisions in fiduciary terms, and that was never the intent of ERISA.

Finally, it should be obvious that an employer does not violate a fiduciary duty under ERISA simply by refusing to act against its own economic interest. A severance payment is not like a gold watch – it has an economic purpose above and beyond merely generating good feelings. One of the

---

[2]Plaintiffs concede that they had begun their job hunt long before receiving the March 10 letters. Thus, as Defendants point out, even if the decision to keep the mill open was conveyed immediately, that would have had little impact on Plaintiffs.

purposes of a severance plan in a case like this is to ensure that employees do not all jump ship before the business is actually ready to wind up.³ Thus, NewPage would have no reason to grant severance payments to Plaintiffs when they were quitting before the employer was ready for them to go. NewPage was not paying Plaintiffs thousands of dollars simply as a reward for a job well-done; it was a *quid pro quo*, and Plaintiffs, by leaving early, refused to provide the *quid*. Once NewPage decided to remain open, it was under no fiduciary obligation to allow its employees to take advantage of a severance offer it sought to revoke. The fact that the company allowed other employees out means those employees essentially received a minor windfall. It does not mean Plaintiffs' rights under ERISA were violated.

### C. Estoppel

The complaint also brings a claim of estoppel. ERISA allows courts to grant equitable relief, 29 U.S.C. § 1132(a)(3), and in some ERISA cases courts have applied the equitable doctrine of estoppel. "[I]n order to prevail on an estoppel claim under ERISA, we ordinarily require that plaintiffs show: (1) a knowing misrepresentation; (2) made in writing; (3) reasonable reliance on that representation by them; (4) to their detriment." *Kannapien v. Quaker Oats Co.,* 507 F.3d 629, 636 (7th Cir. 2007).⁴

---

³*See, e.g., In re Artesian Industries, Inc.,* 1995 WL 264261, *3 (Bkrtcy. N.D. Ohio 1995) ("To be eligible to receive severance pay, an executive had to continue working for Artesian until termination. If he decided to leave the company before he was terminated, his right to severance pay lapsed. Thus, the consideration for the contract was remaining with the company until terminated. Indeed, the purpose of the severance agreements was to retain key management personnel of Artesian to either reorganize it or to maximize the value of its assets as a going concern for the benefit of its creditors.")

⁴The Defendants raise serious questions about preemption of state law promissory estoppel claims under ERISA. The law of preemption, however, is still unsettled, and I will address the claim on its merits rather than on preemption grounds. *See Sembos v. Philips Components,* 376

11

Plaintiffs argue that they were injured by acting in reliance on the company's statements. In particular, the severance agreement sent to LeFebvre stated that he "has been provided at least forty-five (45) days from the date of presentment to consider whether or not to execute this Agreement and waive and release all claims and rights arising under ADEA" [the Age Discrimination in Employment Act]." (Pikola Decl., Ex. Q at 3.) The agreement sent to Reddinger gave her 21 days (she was apparently not covered by the ADEA) to review and sign the agreement. Plaintiffs assert that NewPage should be estopped from revoking its offers because Plaintiffs were "luxuriating" in the time periods the agreements allowed when NewPage essentially pulled the rug out from underneath them. (Pl. Br. at 24.)

Although "ERISA-estoppel can encompass both the concept of promissory estoppel and the concept of equitable estoppel," there must still be a knowing misrepresentation that is relied upon by the Plaintiff. *Kamler v. H/N Telecommunication Services, Inc.,* 305 F.3d 672, 679 (7th Cir. 2002). *Id.* ("The principal problem is that there is no allegation of knowing misrepresentations.") Here, Plaintiffs have not shown that the time periods contained within the severance agreements were misrepresentations at all, much less *knowing* ones. Under the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1)(F)(i), an employee's waiver will not be considered knowing and voluntary unless the individual is given at least twenty-one days to consider

---

F.3d 696, 703 (7th Cir. 2004) ("Whether Sembos' breach of contract and promissory estoppel claims are preempted by Section 514(a) is a difficult question. . . . because . . . Sembos' state law claims fail on the merits and because we can affirm on any basis in the record, we need not delve into the intricacies of ERISA preemption in this case.")

12

the agreement. But in allowing employees a period of time to *consider* an offer, a company is not representing that the offer will necessarily remain *open* for the entirety of that period:

> The statute similarly does not forbid an employer from revoking an offer before the twenty-one days expire. If Ellison's assertion were correct, an employer could not revoke an offered separation agreement even if the day after the offer was made the employee sold the employer's trade secrets to the company's biggest competitor, or the employee decided to shoot the company's president, or, as here, the employee made defamatory statements about the company or its president. The statute does not state that employees must be given the opportunity to waive their ADEA rights and it does not require employers to offer separation agreements. The language of the OWBPA simply seeks to ensure that, if the employee does waive his or her ADEA rights, the waiver is knowing and voluntary. If the offer is revoked prior to its acceptance, then the employee has not waived any rights under the ADEA and the OWBPA is not violated.

*Ellison v. Premier Salons Intern., Inc.,* 164 F.3d 1111, 1114 (8th Cir. 1999).

Although the *Ellison* court was applying these principles in the OWBPA context, the same principles would apply even if the waiver sought by the employer did not relate to any ADEA rights (as with Plaintiff Reddinger). The overriding principle is that an offer may be revoked until it is accepted (unless otherwise stated), and, as the Eighth Circuit noted, merely allowing the offeree a window to review and accept the offer does not somehow render the offer irrevocable. *See, e.g., Sonnenburg v. Grohskopf,* 144 Wis.2d 62, 66, 422 N.W.2d 925, 927 (Wis. Ct. App. 1988) (Statute requiring defendant to accept settlement offer within ten days "in no way implies that the legislature intended to deprive an offeror of the well-settled right to revoke an offer any time before acceptance.") After all, what consideration did NewPage receive from Plaintiffs for its supposedly irrevocable offer? If a company makes an irrevocable offer, as opposed to a revocable offer, it is limiting its freedom to revoke the offer, and it must receive some form of consideration for that sacrifice. *Ganser v. Schwartz,* 1998 WL 19840, *3 (Wis. Ct. App. 1998) ("The offer ripens into a

13

binding and irrevocable 'option contract' if consideration is given, but can be withdrawn any time before acceptance if not based on consideration.)  In other words, the irrevocability of an offer is *itself* a kind of contract (*e.g.*, an "option contract" – a contract to enter into a contract), and there is no whiff of such an arrangement here.  Accordingly, because the company was free to revoke its offer before acceptance, the fact that it allowed twenty-one or forty-five days for Plaintiffs to consider the severance packages did not constitute a "misrepresentation" that the company's offer would be irrevocable for that period of time.

In addition, there is no suggestion in the record, apart from innuendo, that the Defendants engaged in any kind of *knowing* misrepresentation.  By all accounts, the company simply changed its mind about closing the plant after it realized there would be a demand for its products through the summer.  This is underscored by the fact that the company tried to retain the Plaintiffs by offering a retention bonus.  The notion that the company engineered the entire situation in order to induce certain employees to forego their severance payments is based purely on wild speculation that is undermined by the facts in the record.

Although the fact that there was no misrepresentation dooms any estoppel claim, it is worth exploring the related questions of reliance and injury.  Plaintiffs maintain repeatedly that they acted to their detriment in reliance on the company's statements, but the unfortunate truth is that the Plaintiffs did *not* act.  The most effective way to "rely" on an offer is to *accept* it, not to wait two weeks until the offeror has revoked it.  Although Plaintiffs' actions were certainly understandable (they had no inkling that the mill might remain open longer) the company's offer of severance did not state that it would remain open forever.  "Luxuriating" in a window of irrevocability is not reasonable reliance when the window is nonexistent.  *See, e.g., Essroc Cement Corp. v. CPRIN,*

14

*Inc.,* 2009 WL 2033052, *15 (W. D. Mich. 2009) (Defendants would not have reasonably expected its offer to induce reliance when no evidence that Plaintiff actually accepted offer.)

Finally, it is clear that Plaintiffs were not injured by any statements the Defendants made. Obviously the January announcement that the plant was closing gave rise to the Plaintiffs' efforts to seek employment elsewhere. The unusual scenario that ensued created a dilemma for the Plaintiffs: take the new jobs and forego the severance, or get the severance by staying with the company through the fall and placing their new jobs at risk. Either way, however, the plant was still closing and the severance was still being offered to them. Nothing about the company's offer had changed, except for the timing, and they could have received the severance package (plus a retention bonus) had they stayed. As such, the harm attributable to their reliance on NewPage's statements was *not* the loss of severance payments – because those were still on the table – but the *potential* loss of the jobs they had accepted elsewhere if they chose to stay on and reap the severance package. But since they eliminated that potential loss by taking the new jobs and leaving NewPage, they also eliminated any damage arising out of their reliance on NewPage's statements.

It might be helpful to consider the opposite, and more typical, scenario. Suppose the company had given assurances, following its acquisition, that Reddinger and LeFebvre would have jobs at least through the end of the year. In reliance on that promise, both employees turned down offers of employment from other employers. But then in March the company fired both Plaintiffs, leaving them without their NewPage jobs and without the other viable jobs at different employers. In that case, Plaintiffs could argue that their reliance on the company's promise directly caused their injury because they gave up significant other opportunities in reliance on the company's assurances. *See, e.g., Piekarski v. Home Owners Sav. Bank, F.S.B.,* 956 F.2d 1484, 1494 (8th Cir. 1992)

15

(estoppel can arise out of company's promises of continued employment); *Hernandez v. UPS Supply Chain Solutions, Inc.,* 496 F. Supp.2d 778, 785 (W. D. Tex. 2007) (Plaintiff quit job and moved family in reliance on job offer, which was then revoked, stated claim for promissory estoppel). But here, by contrast, the Plaintiffs *accepted* other jobs in reliance on the company's statements that the Plaintiffs would *not* be employed much longer. Importantly, these acceptances were not set in stone – Plaintiffs could have chosen to stay at NewPage, received their severance, and thus mitigated any loss they would have suffered by leaving. So they did not give up other opportunities (because they accepted them), and they did not give up their severance because NewPage continued to offer it. What happened was that NewPage's statements gave rise to a circumstance in which accepting the new severance package and staying at NewPage was economically disadvantageous – because Plaintiffs wanted to go elsewhere – and so they made a choice to leave. The fact remains that both Plaintiffs could still have accepted the exact same severance package that was originally offered in March, which means the loss of their severance came at their own hands.

### D. ERISA Preempts State Law Claims

Plaintiffs also brought a claim for breach of contract, and they do not dispute that ERISA would preempt its contract claim if ERISA applied. They argue, however, (in direct contradiction to the arguments discussed above) that ERISA does *not* apply to the SENA Severance Pay Plan at all. Their argument on this score is a strained one. They cite *Fort Halifax Packing Co., Inc. v. Cayne,* a Supreme Court case that addressed a Maine statute requiring that "[a]ny employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment." 482 U.S. 1, 4 n.1 (1987). The Supreme Court held that the statute was not pre-empted by ERISA

16

because it did not require employers to establish ERISA plans. The one-time, lump-sum payment required by statute did not require the creation of any "plan" – that is, an ongoing administrative scheme or program for processing claims or benefits. *Id.* at 12.

Plaintiffs liken the severance plan to the one-time payments required by Maine law because it simply requires the employer to cut a check upon certain the occurrence of certain contingencies. But that ignores the nature of a severance plan like SENA's. As demonstrated here, the employer had an administrator who determined eligibility. His determination was not just a rubber stamp; it was based on a reading of the plan itself and application of the key phrase "involuntarily terminated." In other circumstances the administrator would have to determine whether the employee was ineligible because he was terminated for cause, which includes absenteeism, tardiness, fraud, theft, or "other similar dishonest conduct." In addition, employees are not eligible if the company is sold and they are offered a "comparable position" with the new owner. Nor are they eligible if their termination results from fire, flood, bombing, "or other act of God." All of these eligibility requirements require an ongoing administrative structure, that is, someone to exercise discretion and very likely involve a budgeting within the company to meet severance demands from time-to-time. Moreover, the payments are not a lump sum, as in *Fort Halifax*, but are paid out in biweekly installments. Finally, the plan offers a "claims procedure," by which a participant can file a request for review with the administrator and then file an appeal of that decision. (*Id.* at 3.) As such, the SENA plan is a far cry from the one-time, nondiscretionary obligation at issue in *Fort Halifax*. Not surprisingly, severance plans are routinely considered ERISA plans. *See, e.g., Bock v. Computer Associates Intern., Inc.,* 257 F.3d 700, 704 (7th Cir. 2001) ("severance payment plan is governed by ERISA and is properly subject to federal

17

jurisdiction because it is an employee benefit plan.") Accordingly, I conclude the SENA plan is governed by ERISA. As such, the state law contract claim is preempted.

## III. CONCLUSION

For the reasons given above, the Defendants' motion for summary judgment is **GRANTED** and the cases are **DISMISSED**. The Clerk is directed to enter judgment in favor of the Defendants.

**SO ORDERED** this   5th   day of May, 2010.

 s/ William C. Griesbach  
William C. Griesbach  
United States District Judge